

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF TEXAS, | § | No. 08-21-00149-CV |
| | § | Appeal from the |
| Appellant, | § | County Court at Law No. 7 |
| v. | § | of El Paso County, Texas |
| THE CITY OF EL PASO, | § | (TC#2021-DCV-2805) |
| Appellee. | § | |

## **O P I N I O N**

On July 29, 2021, Appellant, Governor Greg Abbott, citing the Texas Disaster Act, issued Executive Order GA-38 prohibiting local government entities, including a city, from requiring the use of face coverings. Several local Texas government entities sought and received injunctive relief prohibiting the Governor from enforcing GA-38 on the basis that it was issued without legal authority and is, therefore, *ultra vires*. *See Abbott v. City of San Antonio*, 648 S.W.3d 498, 503 (Tex. App.—San Antonio 2021, pet. granted); *Abbott v. Jenkins*, No. 05-21-00733-CV, 2021 WL 5445813, at *3 (Tex. App.—Dallas Nov. 22, 2021, pet. granted) (mem. op.); *Abbott v. Harris County*, 641 S.W.3d 514, 519 (Tex. App.—Austin 2022, pet. granted); *Abbott v. La Joya Independent School District*, No. 03-21-00428-CV, 2022 WL 802751, at *1 (Tex. App.—Austin

March 17, 2022, pet. filed) (mem. op.); *Abbott v. County of Fort Bend*, No. 01-21-00453-CV, 2022 WL 7180371, at *1 (Tex. App.—Houston [1st Dist.] Oct. 13, 2022, pet. filed) (mem. op.).

Similarly, Appellee, the City of El Paso ("El Paso"), filed a petition asking the trial court to declare that GA-38 was illegally issued and enjoin the Governor from enforcing it. After an evidentiary hearing, the trial court denied the Governor's plea to the jurisdiction and issued a temporary injunction. We agree with our sister courts of appeal that the Governor acted outside his scope of authority when he issued GA-38. As a result, because El Paso was able to meet the other requirements necessary for obtaining a temporary injunction, we affirm the trial court's order. We also hold the trial court did not error in denying the Governor's plea to the jurisdiction.

## BACKGROUND

After issuing a proclamation under the Texas Disaster Act certifying that "COVID-19 poses an imminent threat of disaster" in all 254 Texas counties, the Governor issued a series of emergency orders addressing a host of issues pertaining to the COVID-19 pandemic.[1] *See generally* TEX. GOV'T CODE ANN. ch. 418. Relevant here is GA-38, issued on July 29, 2021, which, in addition to other things, prohibits local government entities from mandating the wearing of face coverings:

> 3. To ensure the ability of Texans to preserve livelihoods while protecting lives, the following requirements apply:
>
> . . . .
>
> b. In areas where the COVID-19 transmission rate is high, individuals are encouraged to follow the safe practices they have already mastered, such as wearing face coverings over the nose and mouth wherever it is not feasible to maintain six feet of social distancing from another person not in the same household, but no

---

[1] The Governor of the State of Tex., Proclamation No. 41-3720, 45 Tex. Reg. 2087, 2095 (2020); EXECUTIVE ORDERS BY GOVERNOR GREG ABBOTT, https://gov.texas.gov/coronavirus-executive-orders (last visited February 24, 2023) (linking to GA orders GA-08 to GA-40 addressing COVID-19 disaster).

person may be required by any jurisdiction to wear or to mandate the wearing of a face covering.

. . . .

4. To further ensure that no governmental entity can mandate masks, the following requirements shall continue to apply:

a. No governmental entity, including a county, city, school district, and public health authority, and no governmental official may require any person to wear a face covering or to mandate that another person wear a face covering; *provided, however, that:*

i. state supported living centers, government-owned hospitals, and government-operated hospitals may continue to use appropriate policies regarding the wearing of face coverings; and

ii. the Texas Department of Criminal Justice, the Texas Juvenile Justice Department, and any county and municipal jails acting consistent with guidance by the Texas Commission on Jail Standards may continue to use appropriate policies regarding the wearing of face coverings.

. . . .

c. Even though face coverings cannot be mandated by any governmental entity, that does not prevent individuals from wearing one if they choose.

The Governor of the State of Tex., Executive Order GA-38, 46 TEX. REG. 4913, 4914-15 (2021).

GA-38 also states that it "supersede[s] any face-covering requirement imposed by any local governmental entity or official[.]" It also purports to suspend several state statutes, including Chapter 81 of the Health and Safety Code (that addresses control of communicable diseases), and Chapters 121 and 122 of the same code (that authorize and empower "local health authorities"). *Id*. The failure to comply with this executive order subjects a person of a fine up to $1,000. *Id*.

El Paso filed suit against the Governor on August 17, 2021. In its petition, it sought a declaratory judgment that "the Governor's suspension of laws allowing local governments to

3

impose mask requirements is ultra vires and outside the scope of his authority under the Texas Disaster Act of 1975." Specifically, it argued that Texas Government Code § 418.016(a) only permits the Governor to "suspend 'regulatory statutes' governing state officials and agencies" in the case of a disaster, "but not the statutes giving local governments the authority to manage public health within their own jurisdictions." Alternatively, El Paso argued the Texas Disaster Act violates "the Suspension Clause and the Separation of Powers Clause of the Texas Constition" because "only the Legislature has the non-delegable power to suspend laws." The petition also included an application for a temporary restraining order and temporary injunction based on the "imminent irreparable harm" El Paso would suffer if the spread of COVID-19 was allowed to proceed unmitigated because of the Governor's illegal order.

On August 17, the trial court issued an *ex parte* temporary restraining order prohibiting the Governor from "enforcing GA-38 against any local government entity" or official. The TRO also restrained the Governor from suspending several state statutes, including Chapters 81, 121, and 122 of the Texas Health and Safety Code. Citing to his authority under Chapters 81 and 121 of the Texas Health and Safety Code, El Paso's Local Health Authority, Doctor Hector Ocaranza, issued an indoor mask mandate the same day requiring with limited exceptions "for face coverings to be worn covering the nose and mouth in all [non-residential] indoor locations" in El Paso County.

The trial court held an evidentiary hearing on El Paso's application for a temporary injunction on September 2, 2021. The only witness to testify for El Paso was Dr. Ocaranza. He testified that El Paso identified the Delta variant of COVID-19 in the city in July 2021, and because of the highly infectious nature of Delta the city was seeing a large increase in both COVID infections and hospitalizations from week to week. He also testified that El Paso has a "very particular composition" of people that makes it especially vulnerable to COVID-19. Specifically,

4

he testified that a large number of people in El Paso suffer from uncontrolled diabetes and blood pressure, making them more susceptible to complications of infections. At the time of Dr. Ocaranza's testimony, the El Paso metropolitan area had the highest number of COVID-related deaths in Texas. Dr. Ocaranza further claimed that if left unmitigated the Delta variant would spread through the community "very fast" and would quickly overwhelm El Paso's hospitals. He claimed, however, that historical data showed that indoor masks requirements would cause the spread of COVID to level off within ten to fourteen days. Indeed, according to Dr. Ocaranza, he could already see that the number of COVID-related hospitalizations in El Paso had "plateaued and started to decline" since he issued his indoor mask mandate on August 17. Dr. Ocaranza told the trial court that if his indoor mask mandate was not allowed to continue he expected to "see a sharp rise in positive cases, hospitalizations, and ultimately we're going to see many people dying from complications of COVID-19 in our community." The Governor did not present any evidence at the hearing.

The trial court entered an order granting the temporary injunction the same day as the evidentiary hearing. Its order prohibited the Governor or any of his agents from enforcing paragraphs 3(b), 3(g), or (4) of GA-38. It also issued an order denying the Governor's plea to the jurisdiction. This interlocutory appeal followed. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4), (8).

## DISCUSSION

### A.    Issues

The Governor asserts two issues on appeal. First, he argues the trial court abused its discretion by granting El Paso's request to temporarily enjoin enforcement of GA-38. Second, the

5

Governor claims the trial court should have granted his plea to the jurisdiction. We will consider each issue in turn.

**B.      Analysis**

*1.      Temporary injunction*

a.      <u>Standard of review</u>

A temporary injunction is an extraordinary remedy that courts do not issue as a matter of right. *City of San Antonio*, 648 S.W.3d at 504. It serves to "preserve the status quo of the litigation's subject matter pending trial on the merits." *Id.* A party is entitled to a temporary injunction if it establishes (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable imminent and irreparable injury in the interim if the injunction is not granted. *Id.* Thus, the applying party is not required to prove that it will ultimately prevail on the merits. *Id.*

"The decision to grant a temporary injunction lies in the sound discretion of the trial court and is subject to reversal only for a clear abuse of that discretion." *Id.* It is an abuse of discretion if the trial court "misapplies the law to the 'established facts, or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery.'" *Id.*, *quoting State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975). We draw all legitimate inferences from the evidence in favor of the trial court's order. *Id.*

In its petition, El Paso requested a declaration that the "Governor's suspension of laws allowing local governments to impose mask requirements is ultra vires" because it is outside the scope of authority granted to him by the Disaster Act. In the alternative, it argued that Section 418.016 of the Disaster Act is unconstitutional. On appeal, the Governor claims the trial court erred in granting the temporary injunction because El Paso did not establish a probable right to

6

this relief or irreparable harm if an injunction was not granted. He also claims the temporary injunction "disrupted the status quo." We disagree with the Governor.

        b.       <u>Probable right to recovery</u>

To pove an *ultra vires* action against a public official, a plaintiff must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act. *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017), *quoting City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). While these actions are not brought against the state or its subdivisions because of the state's sovereign immunity, an individual state actor—such as a governor—may be sued in their official capacity. *Henrich,* 284 S.W.3d at 373. The Supreme Court of Texas has held that a government official with absolute discretion to act—"free decision making without any constraints"—cannot act without legal authority, and, therefore, is not subject to *ultra vires* suits. *See Houston Belt & Terminal Railway Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016). But a "government officer with some discretion to interpret and apply a law may nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Hall*, 508 S.W.3d at 238, *quoting Houston Belt & Terminal Ry Co.*, 487 S.W.3d at 158. An *ultra vires* suit based on actions taken without legal authority, therefore, has two components: "(1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall*, 508 S.W.3d at 239, *citing Houston Belt*, 487 S.W.3d at 158.

This dispute regarding the extent of the Governor's authority requires construction of the Texas Disaster Act. Statutory construction is a question of law we review de novo. *City of San Antonio*, 648 S.W.3d at 505. When interpreting a statute, our primary objective is to give effect to the legislature's intent. *LJA Engineering Inc. v. Santos*, 652 S.W.3d 916, 919 (Tex. App.—

7

Houston [14th Dist.] 2022, no pet.). Using well established principles of statutory interpretation, we give statutory terms their full effect based on the context and read unambiguous statutory text based on its plain meaning according to the rules of grammar and common usage. *Id.*; *see also Miles v. Texas Central Railroad & Infrastructure, Inc.*, 647 S.W.3d 613, 629 (Tex. 2022). We presume the legislature used (or omitted) every word of a statute for a purpose. *LJA Engineering*, 652 S.W.3d at 919. Further, "we must always consider the statute as a whole rather than its isolated provisions." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001). "We should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone." *Id.*

The Governor argues that El Paso failed to show a probable right to a declaration that he acted *ultra vires* "because GA-38 is a valid exercise of the Governor's authority under the Disaster Act." Specifically, he claims the Disaster Act "deputized the Governor, not localities to manage statewide disasters," and he had the authority to "suspend[] the statutory provisions upon which [El Paso] relies to craft local rules for a statewide disaster." Like our sister courts that have considered these same arguments, we do not agree that the Disaster Act grants the Governor the broad authority he claims. *See City of San Antonio*, 648 S.W.3d at 503; *Jenkins*, 2021 WL 5445813, at *3; *Harris County*, 641 S.W.3d at 519; *La Joya Independent School District*, 2022 WL 802751, at *1; *County of Fort Bend*, 2022 WL 7180371, at *1.

  i. *The Governor's power to pre-empt local orders under the Texas Disaster Act*

The Disaster Act establishes a comprehensive framework that allocates power, duties, and responsibilities across the various levels of the state government and agencies in the case of a disaster. TEX. GOV'T CODE ANN. §§ 418.001-.307; *Harris County*, 641 S.W.3d at 524. Among the stated purposes of the Disaster Act are to (1) clarify and strengthen roles of the governor, state

8

agencies, the judicial branch of state government, and local governments in prevention of, preparation for, response to, and recovery from disasters; (2) authorize and provide for cooperation in disaster mitigation, preparedness, response, and recovery; and (3) authorize and provide for coordination of activities relating to disaster mitigation, preparedness, response, and recovery by agencies and officers of this state, and similar state-local, interstate, federal-state, and foreign activities in which the state and its political subdivisions may participate. *Id*. § 418.002.

Subchapter B of the the Disaster Act outlines the Governor's responsibilities, which includes the responsibility of meeting "the dangers to the state and people presented by disasters." *Id.* § 418.011(1). It allows him to declare a state of disaster within a defined geographic location if he "finds a disaster has occurred or that the occurrence or threat of disaster is imminent." Id. § 418.014(a). "During a state of disaster and the following recovery period, the governor is the commander in chief of state agencies, boards, and commissions having emergency responsibilities." *Id.* § 418.015(c). The Governor is also permitted to "control ingress and egress to and from a disaster area and the movement of persons and the occupancy of premises in the area" and to issue executive orders that "have the force and effect of law." *Id.* §§ 418.018, 418.012. The Governor is also permitted to "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster. *Id.* § 418.016(a).

The Disaster Act also authorizes the presiding officers of local governmental entities, such as mayors and county judges, to issue local disaster declarations. *Id.* § 418.108. Like the authority the Governor has, the Disaster Act allows a county judge or mayor of a municipality to "control ingress to and egress from a disaster area under the jurisdiction and authority of the county judge

9

or mayor and control the movement of persons and the occupancy of premises in that area" after a local disaster is declared. *Id.* § 418.108(g). Further, the Legislature has granted local municipalities authority to administer public health measures even outside the context of a disaster. *See City of San Antonio*, 648 S.W.3d at 506. For example, "[a] home-rule municipality may enforce ordinances necessary to protect health, life, and property and to preserve the good government, order, and security of the municipality and its inhabitants." TEX. LOC. GOV'T CODE ANN. § 54.004. Home-rule municipalities are also allowed to "adopt rules to protect the health of persons in the municipality, including quarantine rules to protect the residents against communicable disease." TEX. HEALTY & SAFETY CODE ANN. § 122.006(1). They are also permitted "to enact . . . more stringent ordinances" than the minimum requirements for sanitation and health protection otherwise required by state law. *Id.* § 341.081(1). "The governing body of a municipality or the commissioners court of a county may enforce any law that is reasonably necessary to protect the public health." *Id.* § 121.003(a). And a designated local health authority is permitted to establish, maintain, and enforce "quarantine in the health authority's jurisdiction." *Id.* § 121.024(c)(1).

Based on this statutory framework, the Governor argues on appeal that his authority under the Disaster Act includes the ability to prohibit local governments from implementing face-covering mandates. Specifically, he argues the Disaster Act requires that orders issued by his office pre-empt contradictory orders issued by local governments. In support of his argument, he claims his prohibition on face-covering mandates is a control over "ingress and egress to and from a disaster area" "because it authorizes the entry of individuals that would be prohibited under [El Paso]'s preferred regime." And because the Legislature gave his executive orders "the force of law," according to the Governor, they pre-empt any contrary local order.

We disagree with the Governor. First, the Disaster Act gives both the Governor and the local authorities "the same authority 'to control ingress and egress'" to and from a disaster site. *Harris* County, 641 S.W.3d at 525. According to the Governor, Section 418.012 of the Disaster Act resolves this conflict by granting him a "tie breaker" by giving his order "the force and effect of law." The Governor's reading of Section 418.012 is too broad. The Disaster Act does not explain how to proceed when there are conflicting orders issued by the Governor and a local authority. *Jenkins*, 2021 WL 5445813, at *10. But it does expressly provide that a county judge's order issued under the Disaster Act would control over a mayor's contradictory order. TEX. GOV'T CODE ANN. § 418.108(h)(2). "That section clearly resolves contemplated conflicts among two actors with concurrent jurisdiction and establishes an explicit chain of command." *Jenkins,* 2021 WL 5445813, at *10. The Legislature did not, however, include similar language to evaluate competing orders between the Governor and El Paso. *Id.* "Had the Legislature intended the governor's executive orders to trump local laws, it would have stated as much, as it did for conflicts between a county judge and mayor." *Id.* But it chose not to. And we must presume the Legislature used (or omitted) every word of a statute for a purpose. *LJA Engineering*, 652 S.W.3d at 919. Further, as the Fifth Court of Appeals recognized "there is nothing in the Texas Constitution giving executive orders preemptive power over laws passed by counties and cities . . . ." *Jenkins*, 2021 WL 5445813, at *11, *citing to State v. El Paso County*, 618 S.W.3d 812, 833 (Tex. App.—El Paso 2020, no pet.) (Rodriguez, J., dissenting).

Further, other portions of the Disaster Act grant local officials' orders preemption over the Governor's. *County of Fort Bend*, 2022 WL 7180371, at *8; *Jenkins*, 2021 WL 5445813, at *11. County judges, for example, are granted the authority to *order* an evacuation while the Governor's authority is limited to *recommending* an evacuation. *Compare* TEX. GOV'T CODE ANN.

11

§ 418.108(f) *with id.* § 418.018(a). "This division of authority related to evacuations is at odds with the Governor's reading of section 418.012's language on 'force and effect of law' to mean that his disaster-related authority always supersedes local authority." *County of Fort Bend*, 2022 WL 7180371, at *8; *see also Jenkins*, 2021 WL 5445813, at *11.

The Disaster Act requires state and local level government officials to cooperate in their response to a disaster that is both local and statewide. *Jenkins*, 2021 WL 544813, at *10. One of the stated purposes of the Act is to "clarify and strengthen the roles" of government actors in responding to a disaster and to provide for "cooperation in disaster . . . response[.]" TEX. GOV'T CODE ANN. § 418.002(4), (5). As a result, the Disaster Act "envisions authorities in multiple levels of government and in multiple branches coordinating their respected responses to the disaster." *Jenkins*, 2021 WL 544813, at *10. To read the Disaster Act as broadly giving the Governor preemptive power over local government officials would be ingoring this stated purpose and specific provisions delineating responsibilities amongst officials at various levels of government. *Id.,* at *11. Consequently, reading the Disaster Act as a whole we agree with our sister courts that the Governor's executive orders do not trump a local government official's orders as a matter of course. *Jenkins*, 2021 WL 5445813, at *10; *Harris County*, 641 S.W.3d at 525; *La Joya Independent School District*, 2022 WL 802751, at *4; *County of Fort Bend*, 2022 WL 7180371, at *9. Consequently, the Governor acted *ultra vires* by claiming that GA-38 superseded any local order in response to COVID-19 that conflicted with the terms of GA-38. The trial court, therefore, did not error in finding that El Paso demonstrated a probable right to a declaration that the Governor acted illegally.[2]

---

[2] The dissent argues the Governor had authority under the facts of this case because the local mask mandate was issued by the local health authority, Dr. Ocaranza. By statute, according to the dissent, the local health authority acts as a member of the state health department and a state officer who is subject to the Governor's role as the "commander

12

## ii. Governor's power to suspend statutes under the Texas Disaster Act

In GA-38, the Governor purports to suspend many of the local health and safety laws discussed above, including Chapters 81 and 121 of the Texas Health and Safety Code, which Dr. Ocaranza relied on in issuing his indoor mask mandate. On appeal, the Governor argues this was a valid action under the terms of Section 418.016(a) of the Disaster Act. Based on the plain statutory language, we disagree.

Section 418.016(a) of the Disaster Act provides:

> The governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster.

First, Section 418.016 only authorizes the suspension of "regulatory statute[s]." And several of our sister courts to have interpreted the statute in this context have held that the statutes the Governor purports to suspend in GA-38 are "not 'regulatory,' but instead are 'grant-of-authority statute[s] giving local authorities the leeway to act in their best independent judgment within the confines of their own jurisdiction.'" *Harris County*, 641 S.W.3d at 528, *quoting State v. El Paso County*, 618 S.W.3d at 839-40 (Rodriguez, J., dissenting); *County of Fort Bend*, 2022 WL 7180371, at *8-*9; *La Joya Independent School District*, 2022 WL 802751, at *5-*6; *City of San Antonio*, 648 S.W.3d

---

in chief" of "state agencies, boards, and commissions having emergency responsibilities." *See* TEX. GOV'T CODE ANN. § 418.015(c); *See* TEX. HEALTH & SAFETY CODE ANN. § 121.024(a). The Governor, however, did not make any argument regarding his supervisory role over local health authorities. While mentioning Dr. Ocaranza in passing, the Governor focused his argument in this case on the Legislature giving his executive orders "the force of law" that pre-empt any contrary local order. Not once in his brief does the Governor assert direct command authority over Dr. Ocaranza as commander in chief of state agencies, nor does he ever draw a meaningful distinction between Dr. Ocaranza and other cities officials or otherwise reference the state medical bureaucracy. If an issue is not raised in the appellant's opening brief, we cannot address that issue on appeal. *Hogg v. Lynch, Chappell & Alsup, P.C.*, 553 S.W.3d 55, 65 (Tex. App.—El Paso 2018, no pet.) ("Our power of review in civil cases is constrained by what arguments appear in the parties' briefs."). "It is not the proper role of this Court to create arguments for an appellant . . . ." *Paselk v. Rabun*, 293 S.W.3d 600, 613 (Tex. App.—Texarkana 2009, pet. denied). Doing so begins to blur the line between neutral arbitrator and advocate. *See id.* As a result, in our opinion, this issue is waived because the Governor did not properly assign this issue for our review.

at 506-07. Chapter 121 of the Texas Health and Safety Code, which is applicable in this case, is one of these grant-of-authority statutes. *County of Fort Bend*, 2022 WL 7180371, at *8-*9. We agree with our sister courts that the Legislature did not authorize the Governor to suspend these grant-of-authority statutes that empower other governmental entities and officials.

Second, we agree with our sister courts that "[b]y singling out 'state business' and, later in the section, 'state agenc[ies],' section 418.016(a) joins with other provisions of the Act to distinguish between state and local matters." *City of San Antonio*, 648 S.W.3d at 507. The Act, for instance, distinguishes a city like El Paso from a state agency by separately defining it as a "political subdivision" or a "local government entity." TEX. GOV'T CODE ANN. § 418.004(6), (10). And other portions of the Disaster Act address "local governments" as being distinct from the Governor and state agencies. *See, e.g.,* TEX. GOV'T CODE ANN. § 418.002(4) (stating a purpose of chapter 418 is to "clarify and strengthen the roles of the *governor, state agencies*, the judicial branch of state government, and *local governments* in prevention of, preparation for, response to, and recovery from disasters." (emphasis added)). The Disaster Act also applies this distinction. For example it makes the Governor "commander in chief of state agencies," but not "political subdivisions" or "local government entities." TEX. GOV'T CODE ANN. § 418.015(c). Consequently, if the "Legislature had intended Section 418.016(a) to reach the ordinances and business of local governments, Section 418.016(a) would have stated an application to 'political subdivision[s]' or 'local government entit[ies] . . . .'" *City of San Antonio*, 648 S.W.3d at 508. But it chose not to. *LJA Engineering*, 652 S.W.3d at 919. As a result, we agree with our sister courts that the Legislature did not intend Section 418.016(a) to apply to matters of local control over public health. *City of San Antonio*, 648 S.W.3d at 508; *Harris County*, 641 S.W.3d at 527-28; *County of Fort Bend*, 2022 WL 7180371, at *9; *La Joya Independent School District*, 2022 WL 802751, at *5-*6. As a

14

result, the Governor acted *ultra vires* by purporting to suspend the various health and safety laws delineated in GA-38. The trial court, therefore, did not error in finding that El Paso demonstrated a probable right to a declaration that the Governor acted illegally.

>        *iii. A note on State v. El Paso County*, 618 S.W.3d 812 (Tex. App.—El Paso 2020, no pet.)

We understand that our analysis here conflicts with our decision in *State v. El Paso County*, 618 S.W.3d 812 (Tex. App.—El Paso 2020, no pet.). In that case, we considered similar issues as those we face here. Specifically, we addressed conflicts between a COVID-19 emergency order issued by the El Paso County Judge and the Governor's Executive Order GA-32 that claimed to "supersede any conflicting order issued by local officials in response to the COVID-19 disaster" and to "suspend [any relevant statute] to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order . . . ." *El Paso County*, 618 S.W.3d at 817-18. In that case, a split panel of this Court largely agreed with the interpretation of the Disaster Act the Governor asserts in the present litigation. *Id.* at 823-25 ("We conclude the nature of the Governor's executive order as having the force of law means its provisions control.") Since *El Paso County* was issued, however, our sister courts of appeal that have considered the issue have unamiously agreed with the interpretations we discussed here.[3] *See City of San Antonio*, 648 S.W.3d at 503; *Jenkins*, 2021 WL 5445813, at \*3; *Harris*

---

[3] The dissent argues these cases are factually distinguishable from the present case because instead of orders from a local health authority they involved directives from politically accountable governmental units such as a county judge, commissioners court, or city. The dissent claims the narrow issue in this case is "whether a local health authority may issue an order compelling indoor masking (or face coverings) in conflict with a like, but opposite order by the governor . . . ." This, however, mistakes the procedural posture of this case. El Paso, not the local health authority, sued the Governor for a declaration that the Disaster Act did not empower the Governor to suspend public health laws that allow the city to impose masking requirements. Therefore, El Paso argued, the Governor exceeded his authority in GA-38 by prohibiting local governments from adopting

15

*County*, 641 S.W.3d at 519; *La Joya Independent School District*, 2022 WL 802751, at *1; *County of Fort Bend*, 2022 WL 7180371, at *1. While we respect the doctrine of *stare decisis* and understand that it has its greatest force in cases, like here, that involve statutory construction, we cannot permit a "seriously mistaken and harmful precedents" to stand. *See Mitschke v. Borromeo*, 645 S.W.3d 251, 265 (Tex. 2022). Further, commentators on the issue advise that intermediate appellate courts should be willing to "reconsider precedent, including statutory interpretations, based on what its sister circuits do." *See* Amy Coney Barrett, *Statutory Stare Decisis in the Courts of Appeals*, 73 Geo. Wash. L. Rev. 317, 350 (2005) ("Although a circuit is not obligated to follow its peers, decisions from coequal courts provide the opportunity both to check reasoning and to advance uniformity."). As detailed above, we find our sister courts' interpretation of the Governor's authority under the Disaster Act persuasive. Consequently, to the extent it conflicts with this opinion, we overrule our decision in *El Paso County*.

### iv. Unconstitutional delegation of legislative authority to the Governor

As an alternative to its *ultra vires* claim, El Paso also sought in its petition "a declaratory judgment that the Texas Disaster Act . . . [v]iolates the Suspension Clause and the Separation of Powers Clause of the Texas Constitution." Specifically, it claimed that if the courts found that Section 418.016 of the Texas Government Code "allows the Governor to suspend any and all laws that authorize the City . . . to impose a mask requirement, then the statute itself is unconstitutional

---

mask mandates. Dr. Ocaranza did not issue the mask mandate at issue in this case until *after* the trial court issued the temporary restraining order in response to El Paso's petition. And he issued the order in his role as the local health authority for El Paso. As a result, we do not see the issue in this case as the dissent does as being about "dueling orders." It is instead a case about the Governor's powers over local government units in the event of a state-wide disaster. The cases we cite from our sister courts, while perhaps distinguishable procedurally from the current case, explore this same issue. As a result, we find them relevant and persuasive.

. . . ." Having already determined that Section 418.016 does not permit the Governor to suspend laws applicable to El Paso, discussion of the constitutional question is not necessary for disposition of this appeal. For the following reasons, however, we do find Texas Goverment Code § 418.016 would be unconstitutional if we did adopt the Governor's interpretation.

Under the separation of powers doctrine, any attempt by one department to exercise the powers of another department, or any attempt by one department to delegate its powers to another department, is not permitted. *See generally* TEX. CONST. art. II, § 1. "Although one department has occasionally exercised a power that would otherwise seem to fit within the power of another department, courts have approved those actions only when authorized by an express provision of the constitution." *State v. Stephens*, No. PD-1032-20, PD-1033-20, 2021 WL 5917198, at *4 (Tex. Crim. App. Dec. 15, 2021). "Exceptions to the constitutionally mandated separation of powers are never to be implied in the least; they must be 'expressly permitted' by the Constitution itself." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 570 (Tex. 2013).

The interaction of three separate provisions of the Texas Constitution governs the constitutional issue in this appeal. The first provision is the Texas Constitution's separation-of-powers provision itself, which states:

> The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confined to a separate body of magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1.

Unlike the Federal Constitution, which contains no express separation of powers provision and in which separation of powers is implied by the three-branch structure of government, the

17

Texas Constitution contains an explicit separation of powers provision. *See Stephens*, 2021 WL 5917198, at *3. This textual difference "suggests that Texas would more aggressively enforce separation of powers between its governmental branches than would the federal government." *Id*. (internal citation omitted). "This separation of powers provision reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government." *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239 (Tex. Crim. App. 1990).

Article III, section 1 vests "[t]he Legislative power of this State" in a "Senate and House of Representatives." TEX. CONST. art. III, § 1. In Texas, "legislative power" is defined broadly to include "the power to set public policy" as well as "many functions that have administrative aspects, including the power to provide the details of the law, to promulgate rules and regulations to apply the law, and to ascertain conditions upon which existing laws may operate." *FM Props. Op. Co. v. City of Austin*, 22 S.W.3d 868, 873 (Tex. 2000). The interpretive commentary to Article III, section 1 provides a succinct summary of what constitutes legislative power and how this vesting clause interacts with the Texas Constitution's separation-of-powers clause:

> This section creates the Texas Legislature and vests therein the legislative power, i.e., the law-making power of the people. The legislature is one of the three coordinate branches of the state government, but it occupies the most fundamental and important position in the government's framework--the mainspring of state activities. Its primary function is to formulate the policy of the state.
>
> . . . .
>
> *A settled maxim of constitutional law is that the power conferred upon the legislature to make the laws cannot be delegated by that department to any other body or authority*. The essential legislative functions are by this section vested in the legislature and there they must remain.
>
> This principle is set forth in Article II, which specifically provides that no one of the three branches of government may exercise powers properly belonging to the

other. Thus, *since the legislative power is vested in the legislature, such power may not be given to one of the other branches*. (emphasis added).

TEX. CONST. art. III, § 1 interp. commentary (2022).

Another constitutional provision located at Article I, section 28 takes this prohibition on delegation of legislative authority one step further by specifically forbidding any entity other than the Legislature from suspending laws: "No power of suspending laws in this State shall be exercised except by the Legislature." TEX. CONST. art. I, § 28. This version of the Texas Constitution's Suspension Clause represents an explicit attempt to restrict the Legislature from delegating the ability to suspend laws to other entities, a power which had been granted under previous version of the Texas Constitution but later taken away after a governor used quasi-legislative emergency powers during Reconstruction to sideline political enemies and divest oppositional local authorities of their inherent right to self-govern. *See El Paso Cty.*, 618 S.W.3d at 829-31 (Rodriguez, J., dissenting)(citing A.J. Thomas, Jr. & Ann Van Wynen Thomas, *The Texas Constitution of 1876,* 35 TEX. L. REV. 907, 912-14 (1957)). As the interpretative commentary to the Suspension Clause notes:

> Under former constitutions of the State, the suspension of laws could be exercised by the Legislature, 'or its authority'. The Constitution of 1876 omits the words, 'or its authority'. Therefore, there is evinced a desire upon the part of the makers of the present constitution to restrict the power to suspend laws to direct action upon the part of the Legislature. The authority of the Legislature to delegate its powers to suspend laws was thereby repealed.

TEX. CONST. art. I, § 28 interp. commentary (2022) (citing *McDonald v. Denton*, 132 S.W. 823, 824 (Tex. Civ.App. 1910, writ denied)).

Although the Texas Constitution's separation of powers clause frames the distinction between the three branches of state government rigidly, the Texas Supreme Court has generally acknowledged that the Legislature may delegate some of its legislative authority to public or

private entities while still recognizing a constitutional restriction based on "a question of degree" and, for public entities, the existence of "reasonable standards to guide the agency in exercising those powers." *FM Props. Op. Co.*, 22 S.W.3d at 873. And as the Texas Court of Criminal Appeals has recognized in the delegation context, it is understood that the Legislature may, after "declaring a policy and fixing a primary standard, confer upon executive or administrative officers the power to fill up the details." *Williams v. State*, 176 S.W.2d 177, 183 (Tex. Crim. App. 1943).

That said, when it comes to the Legislature's power to suspend statutory law, for more than a century the Texas Supreme Court has also recognized that as per TEX. CONST. art. I, § 28, the Legislature "cannot now delegate to a municipal corporation or to any one else authority to suspend a statute law of the state," and any attempt by the Legislature to delegate that authority "would be void[.]" *Brown Cracker & Candy Co. v. City of Dallas*, 137 S.W. 342, 343 (Tex. 1911). Put another way, while the Legislature may delegate some degree of filling in the enforcement details to an executive or administrative official subject to reasonable guiding standards, *see FM Props. Op. Co.,* 22 S.W.3d at 873, the Legislature cannot delegate the ability to suspend or alter laws to any other entity. *Brown Cracker & Candy Co.*, 137 S.W. at 343

The holdings in *FM Properties* and *Brown Cracker & Candy* serve as bookends on the limits of the Legislature's ability to delegate power to the executive and demarcate checks not only on executive power, but on legislative power. "The legislature may delegate rule-making power to facilitate administration of the law," but a "[g]rant by the legislature to boards and commissions of the power to suspend rules made by . . . administrative bodies is not the same as [a] grant of power to suspend a legislative act, [which is] a grant generally not approved by the courts." *Garner v. Lumberton Indep. Sch. Dist.*, 430 S.W.2d 418, 423 (Tex. App.—Austin 1968, no writ). Thus, the executive branch may not suspend statutes, even when invited to do so by the Legislature itself.

20

*Id*. This is consistent with the longstanding principle in administrative law that an agency's regulations and orders cannot supersede or abrogate a statute. *See Satterwhite v. State*, 979 S.W.2d 626, 629 (Tex. Crim. App. 1998)(administrative action taken by the State Bar to enact a rule that would alter or negate the Legislature's creation of a criminal statutory offense was unconstitutional); *Armendariz v. Hershey*, 295 F.Supp. 1351, 1354 (W.D. Tex. 1969)(holding that "it is beyond cavil that a statutory right cannot be taken away by Administrative fiat"); *see also State v. Jackson*, 376 S.W.2d 341, 345 (Tex. 1964)("The rulemaking power of administrative agencies does not permit the enactment of regulations which are inconsistent with the expression of the lawmakers' intent in statutes *other than those* under which the regulations are issued." (emphasis added)). An administrative order that purports to supersede a statute is thus ineffective, because the Legislature cannot delegate that nullification power away to an administrative agency. *Garner*, 430 S.W.2d at 423.

Thus, the threshold question for this Court is whether the Legislature authorized the Governor to suspend statutory law. We have already held that, as applicable to this case, it did not. But, if it did, that delegation of suspension authority would be void under *Brown Cracker & Candy Company*, and so would actions the Governor has taken in reliance on that delegated authority. Here, it is obvious that the Disaster Act's statutory suspension provision at Section 418.016(a) immediately and directly runs afoul of *Brown Cracker & Candy Company's* prohibition against the delegation of the power to suspend statutes.[4] That provision allows the Governor to suspend

---

[4] The Legislature based the Texas Disaster Act of 1975 largely on the Example Disaster Act of 1972, a model code promulgated nationwide by the Council of State Governments that contained statutory suspension authorizations that did not account for Texas' unique constitutional prohibition against statutory suspension. *See* Mikael A. Garcia, *Is the Texas Disaster Act of 1975 Unconstitutional? A Covid-Era Review of Constitutionally Mandated Separation of Powers As It Relates to Chapter 418 of the Texas Government Code*, 25 TEX. REV. L. & POL. 7, 17-20 (2020). One commentator has argued that it is possible that the Legislature never foresaw the constitutional problem presented by the Disaster Act, particularly given that the bill made only minor changes to the Example Disaster Act template and was passed relatively quickly and with little debate. *Id*. at 22-23 (recounting the Act's legislative history).

and rewrite laws passed by the Legislature to enlarge the Governor's power at the expense of other officials identified by the Legislature as proper actors under statute. All other matters aside, the Governor is quite literally asserting the power to pass, rewrite, repeal, and suspend statutory laws of his own accord and wield legislative power entrusted to another branch of government. That is an unconstitutional delegation. *Brown Cracker & Candy Co.*, 137 S.W. at 343.

Because the Legislature impermissibly authorized the Governor to suspend statutes despite the Texas Supreme Court's admonition that Article I, section 28 of the Texas Constitution forbids the Legislature from delegating "to any one else authority to suspend a statute law of the state," *Brown Cracker & Candy Co.*, 137 S.W. at 343, Section 418.016 is an unconstitutional delegation of legislative authority and runs afoul of TEX. CONST. art. I, § 28 and TEX. CONST. art. II, § 1. Section 418.016 of the Texas Disaster Act must be struck down as unconstitutional, and GA-38 is void to the extent it relies on statutory suspension to achieve its purposes.

      c.      <u>Irreparable harm</u>

The Governor also argues that the trial court abused its discretion in issuing temporary injunctive relief because El Paso failed to establish that it would suffer irreparable harm. Specifically, he argues that El Paso failed to show that GA-38's encouragement for citizens to wear masks opposed to a government mandate imposes an irreparable injury. He also claims the trial court failed to "properly weigh the countervailing interests against [El Paso]'s request for injunctive relief." *See NMTC Corp. v. Conarroe*, 99 S.W.3d 865, 868 (Tex. App.—Beaumont 2003, no pet.) ("An application for injunction is a request that a court exercise its equitable jurisdiction, and in exercising that power the court balances competing equities."). We disagree with the Governor.

At the evidentiary hearing, the trial court heard testimony from Dr. Hector Ocaranza, El Paso's Local Health Authority. Dr. Ocaranza testified that since identifying the highly-contagious Delta variant of COVID-19 in El Paso, the city had seen a large increase in both infections and hospitalizations. He also testified that a large number of citizens of El Paso have uncontrolled diabetes and blood pressure, making the city particularly susceptible to complications from infection. Indeed, at the time of the hearing, according to Dr. Ocaranza, El Paso had the highest number of deaths from complications of COVID-19 in the State of Texas. Dr. Ocaranza stated that if nothing was done the Delta variant would spread through El Paso "very fast," overwhelm the city's hospitals, and "ultimately we're going to see many people dying from complications of COVID-19 in our community." He presented historical evidence, however, showing that indoor masks requirements had caused the spread of COVID to level off within ten to fourteen days. In fact, Dr. Ocaranza testified that the data was already showing the number of COVID-related hospitalizations in El Paso had "plateaued and started to decline" in the approximately two weeks between when he issued the mask mandate at issue in this litgation and the evidentiary hearing.

Based on the evidence presented at the hearing, viewed in the light most favorable to the trial court's order, we find that El Paso sufficiently demonstrated it would suffer irreparable harm without a temporary injunction. Dr. Ocaranza's testimony demonstrated that the Delta variant of COVID was quickly spreading through El Paso's vulnerable citizens, was threatening to overwhelm the city's hospitals, and that the mandatory use of face coverings is an effective tool in controlling the spread of COVID-19. Further, "[b]ecause GA-38, by its terms, prevents local governmental entities and officials like [El Paso] from enforcing local orders requiring the use of face coverings, it inflicts irreparable harm on these entities and officials." *Harris County*, 641 S.W.3d at 529, *citing Texas Ass'n of Bus. v. City of Austin*, 565 S.W.3d 425, 441 (Tex. App.—

Austin 2018, pet. denied). Further, the Governor did not present any evidence to show how he would be adversely impacted by the requested injunction. *Id.* As a result, we hold the trial court did not abuse its discretion in finding that El Paso would suffer "probable imminent and irreparable injury" if a temporary injunction was not granted. *See City of San Antonio*, 648 S.W.3d at 504.

### d. Preservation of the status quo

The purpose of a temporary injunction is to preserve the status quo. *City of San Antonio*, 648 S.W.3d at 504; *see also Harris County,* 641 S.W.3d at 529. "In this context, 'status quo' means 'the last, actual, peaceable, non-contested status which preceded the pending controversy.'" *Harris County*, 641 S.W.3d at 529, *quoting Texas Ass'n of Bus.*, 565 S.W.3d at 437. The Governor argues the status quo "was not the moment that [El Paso] decided to require face-covering mandates," but was instead "when the Governor issued GA-36" in May 2021 "which as a general matter [like GA-38] prohibited localities from imposing any manner of face-covering requirements." As a result, according to the Governor, the status quo was a prohibition against face-covering mandates that had existed since at least May 2021, and the trial court's temporary injunction upended, instead of preserved, the status quo.

As already discussed, the trial court did not abuse its discretion in finding that El Paso established a probable right to relief on its claim that the Governor's issuance of GA-38 was an *ultra vires* act. And "'[c]ontinuation of illegal conduct cannot be justified as preservation of the status quo.'" *Harris County*, 641 S.W.3d at 530, *quoting In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding). And, as the Third Court of Appeals stated, "[i]f GA-38 is determined to be ultra vires and invalid, GA-36 would be ultra vires and invalid for the same reason." *Id*. "Consequently, GA-36 cannot constitute the 'status quo' as a matter of law." *Id.* As a result, we

agree with the Third Court of Appeals that the temporary injunction as granted returns the "parties to the position they were in prior to the Governor's ultra vires actions." *Id.*

For theses reasons, we hold the trial court did not abuse its discretion in granting El Paso's application for a temporary injunction. We, therefore, overrule the Governor's first issue.

### 2. Plea to the jurisdiction

In his second issue, the Governor argues the trial court erred in denying its plea to the jurisdiction. He asserts three positions in support of this argument. First, he claims that as the Governor, he is protected from suit by sovereign immunity unless El Paso shows he acted *ultra vires*. Because El Paso failed to show he acted in an *ultra vires* manner, the Governor argues he is immune from suit. Second, he claims El Paso does not have standing to sue him. Third, he claims the trial court did not have jurisdiction because only the Texas Supreme Court can enjoin the Governor. Having already found that El Paso demonstrated a probable right to a declaration that the Governor acted *ultra vires* in issuing GA-38, the Governor's first contention is without merit. We discuss the remaining two issues in turn.

### a. Standing

The Governor contends El Paso lacks standing to sue him for an injunction, as a favorable ruling would not grant El Paso relief-in-fact from the effects of GA-38 because the Governor under the Texas Disaster Act can only set policy, not enforce it. We disagree.

Standing is a constitutional prerequisite to suit, and a court has no subject-matter jurisdiction over a claim made by a party who lacks standing to assert it. *City of El Paso v. Tom Brown Ministries*, 505 S.W.3d 124, 137 (Tex. App.—El Paso 2016, no pet.). We apply the following three-step test in determining whether a party has standing to bring a lawsuit:

(1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected or cognizable interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) there must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant and not the independent action of a third party not before the court; and

(3) it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision.

*Id*. at 137, (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001)).

Here, the Governor focuses his argument on the second and third steps of the standing analysis, contending that an injunction against the Governor will not redress El Paso's injury because the Governor merely promulgates policy and does not enforce it, and so the proper defendants would be either administrative bodies or law enforcement officials charged with executing the Governor's wishes. *See In re Abbott (GA-09 Abortion Litigation)*, 956 F.3d 696, 709 (5th Cir. 2020*), vacated as moot sub nom Planned Parenthood Ctr. for Choice v. Abbott*, 141 S.Ct. 1261 (2021) (overturning a TRO preventing the Governor from enforcing a COVID-19 Disaster Act executive order banning abortions as not medically necessary because the Governor could not directly enforce executive order against abortion providers).

Three of our sister courts recently rejected this argument in similar Disaster Act cases, holding that the City of San Antonio and Bexar County had standing to sue the Governor and enjoin GA-38 because their injury was "traceable to the Governor's actions to author and promulgate Executive Order GA-38 and [the] enforceability provisions therein," since "[w]ere it not for the executive order there would be no question as to the legality" of the City and County's actions. *See City of San Antonio*, 648 S.W.3d at 512; *see also Harris County*, 641 S.W.3d at 522;

26

*Jenkins*, 2021 WL 5445813, at \*7. The Fourth Court further held that the enforcement mechanism issue did not affect the traceability analysis for purposes of standing, since even if the Governor did not have a way to directly enforce the order, he was ultimately the person responsible for the executive order's existence. *City of San Antonio*, 648 S.W.3d at 512 n.7, (citing *Mi Familia Vota v. Abbott*, 497 F.Supp.3d 195, 210 (W.D. Tex. 2020), *stayed pending appeal* 834 Fed.App. 860, (5th Cir. 2020)). We agree with our sister courts' analyses.

Additionally, the Fifth Circuit's decision in *In re Abbott (GA-09 Abortion Litigation)* narrowly focused on only the Governor's power to promulgate executive orders under TEX. GOV'T CODE ANN. § 418.012, *see id.* at 709, and the courts that have found a lack of standing in executive order litigation cases have relied either directly or indirectly on the Fifth Circuit's narrow understanding of the Governor's power under the Texas Disaster Act. *See*, *e.g.*, *6th St. Bus. Partners, L.L.C. v. Abbott*, No. 1:20-CV-706-RP, 2020 WL 4274589, at \*3 (W.D. Tex. July 24, 2020) (holding that *In re Abbott (GA-09 Abortion Litigation)* establishes that the Texas Disaster Act "empowers the governor to promulgate executive orders, [but] it does not empower the governor to enforce them"); *Ector Cty. All. of Businesses v. Abbott*, No. 11-20-00206-CV, 2021 WL 4097106, at \*10 (Tex. App.—Eastland Sept. 9, 2021, no pet.) (mem. op.) (citing to *6th Street Business Partners* for the proposition that "Texas law does not explicitly grant Abbott the power to enforce compliance with" his executive orders, meaning that enjoining "certain activities by Abbott would [not] redress their injury").

However, the Fifth Circuit's conception of the Governor as a passive functionary unable to do anything other than issue executive orders is mistaken. Section 418.012 does not define the entirety of the Governor's authority under the Texas Disaster Act. The Governor's powers under the Texas Disaster Act include far more than simply giving him the ability to issue executive

27

orders. The Act makes the Governor the "commander in chief of state agencies, boards, and commissions having emergency responsibilities[,]" TEX. GOV'T CODE ANN. § 418.015(c), and it also contains numerous provisions outlining when the Governor may act directly, when he may act through agents, when he may act indirectly through the power of appointing officials, and when he may simply provide advice.

Furthermore, the Texas Constitution's Take Care Clause analogue provision located at TEX. CONST. art. IV, § 10, states that the Governor "shall cause the laws to be faithfully executed[,]" implying that even under the weak governor/plural executive setup, the Governor must have some type of influence or authority to enforce laws. And he does: the Governor has the recognized statutory ability to personally "assume command and direct the activities" of the Texas Department of Public Safety "during a public disaster" or "to perform the governor's constitutional duty to enforce law," *see* TEX. GOV'T CODE ANN. § 411.012. This includes the ability to order TDPS to execute civil process and arrests if needed. *Cf. In re Abbott (House Quorum Arrest Litigation)*, 628 S.W.3d 288, 290-91 & n.3 (Tex. 2021) (mandamus litigation brought by Governor as relator to dissolve TRO preventing him and other relators from using the "Department of Public Safety, Texas Rangers, Texas Highway Patrol Officers . . . or other law enforcement officials" to enforce a legislative order to arrest Democratic House members who broke quorum).

Even if we accept the Fifth Circuit's enforcement disconnect rationale as bearing on the question of standing, there is no intermediate enforcer standing between the Governor and El Paso. Unlike in *In re Abbott (GA-09 Abortion Litigation)*, *6th Street Business Partners*, and *Ector County Alliance of Businesses*, which involved enforcement via the State's administrative and law enforcement bureaucracy, here, the Governor is asserting a direct right under TEX. GOV'T CODE ANN. § 418.018(c) to outright control of a disaster zone encompassing the entire state, including

28

the City of El Paso, and he claims that his orders control over those of local officials because his powers as Governor effectively work to oust local officials of their traditional roles within their geographic districts. And in light of the Governor's ability to issue orders to TDPS to execute during times of public disaster or in service of his duty to take care that the State's laws are executed, and in light of the fact that the Texas Disaster Act gives his executive orders "the force and effect of law," TEX. GOV'T CODE ANN. § 418.012, it can hardly be said that the Texas Disaster Act "empowers the governor to promulgate executive orders" but he is nevertheless not "empower[ed] . . . to enforce them." *6th St. Bus. Partners, L.L.C.*, 2020 WL 4274589, at *3.

Given the Governor's attempt to directly control territory within the disaster zone and countermand local authorities who would otherwise have jurisdiction over the disputed territory, an injunction would provide El Paso relief-in-fact by enjoining the Governor in his role as the alleged direct manager of ingress to, egress from, and occupancy of the disaster zone, of which the City of El Paso is a part. It would also enjoin the Governor's ability to use TDPS personnel—over whom the Governor has direct authority—to arrest potential violators of GA-38 or otherwise civilly implement gubernatorial directives to enforce the disputed provisions of GA-38. In short, the Governor is unquestionably the proper defendant under the circumstances. Standing has been established.

Finally, the Governor asserts that even if he does have direct enforcement authority, the El Paso's pre-enforcement challenge to the executive order was not ripe because the risk of actual enforcement was speculative. The Governor tries to analogize this case to a constitutional challenge brought by sixteen state district judges against the Governor to enjoin enforcement of a previous Texas Disaster Act executive order that purported to criminalize the "release [by judges of] jail inmates with violent histories during the current state of disaster." *In re Abbott (GA-13 Bail*

29

*Litigation)*, 601 S.W.3d 802, 805 (Tex. 2020). But *In re Abbott (GA-13 Bail Litigation)* involves an incredibly idiosyncratic set of facts and deals with separation of powers issues as between the executive and judicial branches, and that case is readily distinguishable on multiple grounds, including the fact that the Texas Supreme Court held that criminal prosecution of the judges was unlikely because the judges would likely be shielded from criminal liability by judicial immunity. *Id*. City officials do not possess judicial immunity.

Most importantly of all, unlike in *In re Abbott (GA-13 Bail Litigation*), the Governor in his brief here has not "disclaim[ed] any intention by the Governor or the Attorney General to affirmatively enforce" this executive order. *Id*. at 802. On the contrary, the Governor and the Attorney General have made multiple public statements threatening to aggressively pursue local authorities to create a uniform statewide COVID-19 response. Indeed, beyond merely defending multiple pending suits brought by local entities, the Attorney General has also initiated litigation on the Governor's behalf against other local entities that are believed to be violating GA-38. *See* Joshua Fetcher, *A Texas school district doesn't require masks. The state is suing the district anyway*. THE TEXAS TRIBUNE (Sept. 14, 2021, 5:00 p.m. CDT), https://www.texastribune.org/2021/09/14/texas-mask-mandate-lawsuits/ (reporting that the Attorney General had sued fifteen separate school districts as of September 14, 2021).

El Paso has established standing against the Governor.

b.      Authority of the county court to enjoin the Governor

The Governor asserts that the county court's temporary injunction is void because under TEX. GOV'T CODE ANN. § 22.002(c), only the Texas Supreme Court can issue an injunction against executive officers, not the trial court. As our sister court recognized, the Governor's argument on this point is incorrect. *See Jenkins*, 2021 WL 5445813, at *7-*8.

District courts are always the courts of exclusive original jurisdiction for writs such as writs of injunction unless the constitution or another law confers such jurisdiction on another tribunal. *See A & T Consultants, Inc. v. Sharp*, 904 S.W.2d 668, 671-72 (Tex. 1995); TEX. CONST. art. V, § 8; TEX. GOV'T CODE ANN. § 24.011. The Texas Legislature has extended the power to grant writs of injunction to the statutory county courts at law, *see id*. § 25.0004(a).

Section 22.002(c) of the Texas Government Code vests the Texas Supreme Court with the exclusive authority to "issue a writ of mandamus or injunction, or any other mandatory or compulsory writ or process, against any of the officers of the executive departments of the government of this state *to order or compel the performance of a judicial, ministerial, or discretionary act or duty that, by state law, the officer or officers are authorized to perform*." TEX. GOV'T CODE ANN. § 22.002(c) (emphasis added).

Reading the statutory text as written, under Section 22.002(c), the Texas Supreme Court is the only court in Texas that can compel the Governor to affirmatively perform an act. *Id*. However, this narrowly written grant of injunction authority to the Texas Supreme Court does not strip other courts of the ability to issue other types of injunctions against executive officials, such as injunctions *restraining* an executive official from engaging in an illegal or *ultra vires* act. Indeed, this distinction between the Texas Supreme Court's exclusive ability to "enforce the performance of a legal duty" by an executive officer and the power reserved to the lower courts of "restraining him from carrying into effect an illegal act" in the first instance is longstanding and has been recognized for more than a century. *See Terrell v. Middleton*, 187 S.W. 367, 369-70 (Tex. App.— San Antonio 1916, writ denied). The plain text of Section 22.002(c) tracks this historical understanding of how injunction powers are distributed vertically among the courts and solidifies the position of district courts as able to issue injunctions *restraining* illegal acts by executive

31

officials by vesting the Texas Supreme Court with the limited power to issue only affirmative injunctions *compelling* executive officials to engage in judicial, ministerial, or discretionary action. *See Canales v. Paxton*, No. 03-19-00259-CV, 2020 WL 5884123, at *2 (Tex. App.—Austin Sept. 30, 2020, pet. ref'd) (mem. op.) (district court has original jurisdiction to issue an injunction restraining unlawful executive action notwithstanding Section 22.002(c)'s vesting of exclusive jurisdiction to issue injunctions compelling executive action with Texas Supreme Court).

Because El Paso only wished to restrain enforcement of certain provisions of an executive order pending a determination as to the legality of the Governor's actions, and not to force the Governor to engage in any affirmative actions, the trial court had jurisdiction to enter a temporary injunction order.

For these reasons, we find the trial court properly denied the Governor's plea to the jurisdiction. We, therefore, overrule the Governor's second issue.

## III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's order granting El Paso a temporary injunction. We also affirm the trial court's denial of the Governor's plea to the jurisdiction.


YVONNE T. RODRIGUEZ, Chief Justice

February 28, 2023

Before Rodriguez, C.J., Palafox, J., and Ferguson, Judge
Ferguson, Judge (Sitting by Assignment)

32